**FILED**
**Oct 10, 2024**
**01:54 PM(ET)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT CHATTANOOGA

| | |
|---|---|
| **Jason Bednar,** | ) **Docket No.: 2018-01-0218** |
| **Employee,** | ) |
| **v.** | ) |
| **Memorial Healthcare System d/b/a** | ) |
| **Memorial Hospital,** | ) |
| **Employer,** | ) |
| **Indemnity Ins. Co. of N.A.,** | ) **State File No.: 9290-2018** |
| **Carrier,** | ) |
| **And** | ) |
| **Troy Haley, Administrator of the** | ) |
| **Bureau of Workers' Compensation** | ) **Judge Audrey Headrick** |
| **Subsequent Injury and Vocational** | ) |
| **Recovery Fund.** | ) |

## COMPENSATION ORDER

Mr. Bednar claimed permanent and total disability benefits from a January 30, 2018 accident that allegedly caused significant physical and mental injuries. Memorial authorized Mr. Bednar's medical treatment but later disputed the compensability of his alleged injuries based on his preexisting conditions, denying that it owed additional benefits. For the reasons below, the Court denies Mr. Bednar's claim.

### History of Claim

On January 30, 2018, Mr. Bednar, a registered nurse, placed his knee on a patient's bed, pulled the sheet to assist others in transferring the patient, and felt sharp pain in his back.

Mr. Bednar previously sustained two work injuries involving low-back and right lower-extremity pain. The 2005 injury quickly healed. His 2006 low-back injury settled in 2007 based on a 5% impairment with open future medical treatment.

Mr. Bednar started working for Memorial in 2015. To understand the basis for the

1

disputed diagnoses, a review of his extensive past medical treatment is needed.

*Pre-Injury Medical Treatment*

For years, Mr. Bednar saw Dr. Steven Musick, a pain management physician, for his 2006 work injury. He received medications, including fentanyl patches, gabapentin, oxycodone, and epidural steroid injections.

In early 2016, Mr. Bednar complained to Dr. Musick of low-back pain, right-lumbar radiculopathy, and sexual dysfunction after taking morphine. He reported a pain level of eight out of ten relieved only by lying on his back and taking medication. Mr. Bednar's wife asked Dr. Musick to refer him to "psychiatry and/or counseling." Dr. Musick recommended several psychiatrists and noted increased stress related to an extensive skin cancer removal from his nose.

After that appointment with Dr. Musick, Mr. Bednar drove from Chattanooga to a Nashville hospital emergency department requesting admission for anxiety, depression, and feeling out of control. The psychiatrist stated he reported that severe depression caused him not to sleep, bathe, or interact with his three children. Mr. Bednar also reported constant sweating and an inability to focus/concentrate. The psychiatrist diagnosed acute anxiety and acute-on-chronic depression. Mr. Bednar met the criteria for inpatient hospitalization, but he declined.

Soon after, Mr. Bednar returned to Dr. Musick, disclosed his trip to the Nashville hospital, and requested amitriptyline for depression and anxiety because a doctor recently took him off ativan, a benzodiazepine.

Mr. Bednar later sought psychological treatment from a local mental health clinic and saw a licensed social worker. He reported depression symptoms, including inactivity, sadness, crying spells, sleep disturbance, inability to focus/concentrate, and an erratic diet. Mr. Bednar revealed receiving treatment for anxiety for six years and developing depression after his back injury, including difficulty accepting a less active lifestyle. The social worker diagnosed major recurrent moderate depression.

At his next visit at the mental health clinic, a psychiatrist removed the social worker's depression diagnosis. He described the Nashville episode as "more of an adjustment disorder than an episode of major depression." The primary diagnosis was generalized anxiety disorder, or "GAD."

At other visits at the clinic, Mr. Bednar rated his depression symptoms as bad. He reported taking ativan prescribed in 2009 as the only medicine that ever helped him. The records reflect discussing the importance of eating a healthy diet and daily exercise.

2

Mr. Bednar later went to another clinic, where he discussed his anxiety and requested a psychiatrist referral. He received diagnoses of anxiety and depression and a referral to psychiatry.

In late 2016, Dr. Musick referred Mr. Bednar to Dr. Richard Pearce, an orthopedist, to treat his 2006 work injury, including ongoing low-back and right lower-extremity pain with numbness and tingling. In early 2017, Mr. Bednar complained to Dr. Pearce of worsening pain, anxiety, and depression, and he asked to proceed with a recommended back fusion.

Soon after, Dr. Musick referred Mr. Bednar to Dr. Gregory Ball to assume ongoing pain management. In Dr. Ball's intake form, Mr. Bednar's depression screening showed little interest or pleasure in doing things and feeling down, depressed, or hopeless. Dr. Ball noted Dr. Musick had ordered a spinal cord stimulator, which the carrier denied. Mr. Bednar worked full-time as a nurse while on high-dose oxycodone and fentanyl patches, but he reported an inability to enjoy outdoor activities.

Dr. Ball gave Mr. Bednar the following diagnoses: lumbosacral radiculopathy; lumbar disc disease; lumbar spinal stenosis; inflammation of the right sacroiliac joint; chronic low-back pain; ED; chronic opiate use; and other long-term drug therapy. He considered ordering a spinal cord stimulator but decided against it because of Dr. Pearce's surgery recommendation and his progressive neurologic symptoms. He increased Mr. Bednar's narcotic dosage.

Dr. Pearce ultimately performed Mr. Bednar's back fusion surgery in August 2017. Afterwards, Dr. Ball started reducing Mr. Bednar's narcotic dosage. Dr. Ball documented complaints of burning in both legs and occasional right-buttock pain. By December 2017, Dr. Pearce noted Mr. Bednar walked five miles a day, and he released him to return to work without restrictions in early January.

Dr. Ball saw Mr. Bednar almost two weeks before the 2018 work injury occurred. Rating his pain at six out of ten, Mr. Bednar reported low-back pain, bilateral lower-extremity pain, right-leg numbness, and persistent right-buttock pain. Dr. Ball injected his right piriformis muscle with botox. Mr. Bednar expressed reluctance to continue decreasing his narcotics due to his continued pain and recent return to work.

*Post-Injury Medical Treatment*

Memorial authorized Mr. Bednar to see Dr. Pearce, his surgeon, after the January 30, 2018 work injury. Mr. Bednar complained of low-back pain, SI joint pain, and right-knee pain. X-rays showed no evidence of hardware failure. Dr. Pearce ordered a lumbar MRI and referred him back to Dr. Ball for continued pain management.

3

In March, Mr. Bednar complained to Dr. Ball of low-back pain and bilateral lower-extremity pain, and he rated his pain at six out of ten. Dr. Ball explained that he needed to reduce Mr. Bednar's narcotic dosages and switched him from fentanyl patches to all oral medications.

In April, Mr. Bednar returned to see Dr. Pearce, stating his symptoms improved since his last visit. Dr. Pearce compared his 2017 and 2018 MRIs and found no significant changes. He concluded, "further treatment for his current symptoms will be through [Memorial]."

Later that month, Mr. Bednar returned to Dr. Ball, whom Memorial authorized. Dr. Ball stated Mr. Bednar reported a new work injury with right SI joint pain, and Dr. Ball related the need for an SI injection to his new injury. Mr. Bednar again rated his pain at six out of ten, but he also reported an exacerbation of pain due to stopping fentanyl.

At later visits, Dr. Ball stated that Mr. Bednar's current pain was separate from his previous spine injury and "above the baseline of pain he was experiencing when he had the new injury." This resulted in Mr. Bednar receiving a spinal cord stimulator. Dr. Ball also continued giving Mr. Bednar piriformis and SI joint injections and weaning his opioid dosage.

In September, Dr. Pearce ordered a right-knee EMG/NCS, which findings were consistent with sciatic nerve neuropathy with no evidence of lumbar radiculopathy.

In October, Dr. Ball referred Mr. Bednar to a psychiatrist for depression.

In 2019, Dr. Ball referred Mr. Bednar directly to Dr. Aslam Sandvi, a psychiatrist. Mr. Bednar saw Dr. Sandvi and gave a history of severe depression and anxiety "ever since he was injured . . . due to chronic pain and inability to work." He reported mood swings, suicidal thoughts, and chronic pain symptoms. Mr. Bednar's wife reported a drastic change in his personality.

As a result, Dr. Sandvi diagnosed major depression recurrent severe with vague suicidal ideation, GAD, and PTSD, concluding his "current psychiatric problems are directly related to his job-related injuries." He ordered ongoing psychotherapy and prescribed medications.

Mr. Bednar later returned to Dr. Pearce, who confirmed he saw no pathology on a follow-up MRI to explain his current symptoms and had nothing further to offer.

Mr. Bednar then saw Dr. Michael Tew, an orthopedist, due to his ongoing right-knee pain and weakness. Dr. Tew described Mr. Bednar's pain, numbness, and knee giving way as nerve-related and not mechanical, and he discharged him from care.

4

A repeat right-knee EMG/NCS ordered by Dr. Ball in 2020 was normal.

In late 2020, Mr. Bednar returned to Dr. Tew, who ultimately performed right-knee surgery based upon an MRI showing tears.[1] However, Dr. Tew only found and repaired a medial chondral defect, concluding Mr. Bednar's "knee condition was caused by his work injury a few years ago." After surgery, Dr. Tew told Mr. Bednar to stop using the cane prescribed by Dr. Ball and released him to return to work with restrictions. Later, Mr. Bednar reported a pain level of nine out of ten, and Dr. Tew recommended pain management for complex regional pain syndrome.

Dr. Ball saw Mr. Bednar after his knee surgery. Mr. Bednar reported an acute worsening of pain and stiffness in his knee, color and temperature changes, and sensitivity to touch in the lower leg. Dr. Ball noted "the new onset CRPS symptoms . . . in his knee." Later, Mr. Bednar reported increased pain and swelling in *both* knees.

In 2022, Mr. Bednar ultimately received an intrathecal narcotic pump implant for Dr. Ball to prescribe higher doses than the Centers for Disease Control and Prevention and State of Tennessee permit for oral narcotics.

Mr. Bednar continued seeing Dr. Sandvi for psychiatric care. The records reflect marital problems, isolation from his family, neglecting personal hygiene, and sleeping on the couch during the day. Mr. Bednar reported having suicidal thoughts. Ultimately, he and his wife divorced, resulting in supervised visitation with his children.

As part of his pain management treatment, Dr. Ball treated Mr. Bednar with Transcranial Magnetic Stimulation, or TMS therapy, for major depressive disorder. Mr. Bednar reported "excellent benefit from TMS therapy, claiming his depression [had] been reduced by []95 to 98%." At the same time, Mr. Bednar continued reporting symptoms of severe depression to Dr. Sandvi.

*Medical Proof*
*Pain Management Specialists*

Memorial objected to Dr. Ball's C-32 opinions, which list a July 27, 2006 injury date, so it deposed him. Dr. Ball has been in practice for over 30 years and is certified in pain medicine and anesthesiology.

Dr. Ball stated that the January 2018 injury did not anatomically change Mr. Bednar's low back and acknowledged that most of Mr. Bednar's conditions preexisted the 2018 injury. Dr. Ball said that the injury caused only an increase in Mr. Bednar's pain levels for his preexisting conditions. He acknowledged that Dr. Pearce had previously

---

[1] Before undergoing a right-knee MRI, the spinal cord stimulator was removed.

5

recommended a spinal cord stimulator before the 2018 injury.

Dr. Ball stated that new conditions caused by the 2018 work injury included Mr. Bednar's right knee and CRPS. Relying on the first EMG/NCS, Dr. Ball stated it showed right-sciatic mononeuropathy, which caused Mr. Bednar to fall numerous times due to leg weakness. He stated Mr. Bednar's falling increased after the 2018 injury, which is a sign of progression.

Dr. Ball also discussed a pelvis sacrum MRI, which showed an abnormality of Mr. Bednar's sacrum "at S5 that 'could be' the result of trauma." He stated it represented an anatomical change.

Dr. Ball testified about his decision to implant an intrathecal pain pump. He stated the pain pump was for Mr. Bednar's right SI joint, right knee, and right-leg sciatica. Regarding the right SI joint, he stated, "[i]t is more likely than not that the sacroiliac joint pain is causally related to the second injury sustained while lifting, moving a patient after return to work following spine surgery." Dr. Ball based his opinion on an absence of SI joint symptoms after surgery but agreed SI joint pain is common after a lumbar fusion.

Dr. Ball discussed the risk involved in increasing Mr. Bednar's narcotic dosages, which can sometimes increase a patient's pain, resulting in narcotic-induced hyperalgesia/opioid-induced hyperalgesia. He also mentioned Mr. Bednar's morbid obesity. Mr. Bednar's weight increased by 145 pounds from early 2018 to May 2023. Dr. Ball concluded Mr. Bednar's inactivity due to pain, immobility, and depression caused his progressive weight gain.

Dr. Ball placed Mr. Bednar at maximum medical improvement on February 21, 2023, and assigned a 16% impairment rating. He assigned light-duty work restrictions and completed a Physician Certification Form stating Mr. Bednar no longer had the ability to perform his pre-injury occupation.

Dr. Ball explained his impairment rating, which he agreed to reduce by 1% since Mr. Bednar did not have a medial meniscus tear. Dr. Ball assigned 8% for the sciatic nerve injury, stating the injury increased Mr. Bednar's pain despite his second, normal EMG/NCS study. He assigned 2% for testosterone deficiency from chronic opioid therapy, which he agreed preexisted the injury. Dr. Ball acknowledged that Mr. Bednar took opiates since 2011 but stated he "might have" gotten him off narcotics if the new injury had not occurred.

Dr. Ball also explained the 8% impairment for right lower-extremity CRPS, claiming Mr. Bednar developed CRPS after knee surgery. Dr. Ball disagreed that the Budapest Criteria for diagnosing CRPS requires a doctor to rule out factitious disorder, somatic disorder, and conversion disorder. He also disagreed that a doctor cannot diagnose

6

CRPS if a patient has one of those disorders.

Finally, as a late-filed exhibit, Dr. Ball was asked whether Mr. Bednar retained any impairment for his right-knee chondromalacia. He stated chondromalacia is not ratable.[2]

Dr. Jeffrey Hazlewood, who performed an employer's exam, testified during the hearing, noting he has been in practice almost 30 years and is certified in physical medicine and rehabilitation and pain management.

Dr. Hazlewood performed an in-person, two-hour evaluation with Mr. Bednar in June 2024 and spent over eight hours reviewing his medical records.

Dr. Hazlewood discussed the past medical history given by Mr. Bednar. Regarding his back, Mr. Bednar described four past events: a motor vehicle accident at age 19 that healed within two weeks; a 2005 work injury that healed; a 2006 injury lifting stones that healed; and a 2006 work injury that resulted in a back fusion shortly before the 2018 injury. Mr. Bednar stated he had never seen a psychiatrist or received depression or panic attack diagnoses before the 2018 injury but reported experiencing anxiety during nursing school.

Dr. Hazlewood discussed the questionnaires completed by Mr. Bednar. On the Central Synthetization Index, Mr. Bednar's score showed "probable nociplastic pain syndrome," which means the pain regulators in the brain malfunction. On the depression form, Mr. Bednar's score showed moderate depression. On the anxiety form, his score showed mild anxiety. His Brief Pain Inventory Questionnaire showed he is not very functional, which is typical for someone with chronic pain. Further, the ADL sheet showed Mr. Bednar completes his activities of daily living slower than usual and no longer participates in outdoor activities.

Dr. Hazlewood noted Mr. Bednar did not exhibit atypical pain behavior or Waddell signs during the examination. He stated Mr. Bednar is morbidly obese. Out of nine objective signs for CRPS, Mr. Bednar exhibited right lower-extremity pain, skin redness, and edema. However, Dr. Hazlewood noted that the skin redness and edema appeared in both lower extremities. Mr. Bednar's right knee showed no neurological weakness but exhibited a global decrease in sensation. His SI joint testing was negative.

Dr. Hazlewood disagreed with Dr. Ball's right lower-extremity CRPS diagnosis. He stated the Budapest Criteria requires ruling out other more likely diagnoses, like factitious disorder, somatic symptom disorder, and conversion disorder. Further, Dr. Hazlewood stated an employer's psychiatric exam, addressed below, showed that Mr.

_____

[2] The Court gives no weight to the office note, addendum, or the 2% rating Dr. Ball added to his impairment for chronic pain because they were not subject to cross-examination and went beyond the scope of the question asked.

Bednar has somatic symptom disorder.

Dr. Hazlewood stated that only ten out of one million injuries result in CRPS, which is rare and controversial. He stated Mr. Bednar's symptoms, which affected both lower extremities, are from disuse, which can cause the same symptoms. Mr. Bednar told him he spends most of his day lying down.

Dr. Hazlewood also disagreed with Dr. Ball's sciatic nerve injury diagnosis. He stated the first EMG showed denervation, a nonspecific finding. Dr. Hazlewood stated the NCS showed that the sciatic nerve was normal. Likewise, the second EMG/NCS was normal, and the pelvis MRI showed a normal sciatic nerve. Therefore, Dr. Hazlewood stated the diagnosis was not based on objective diagnostic tests and the normal physical exam.

Dr. Hazlewood stated that Mr. Bednar's testosterone deficiency/ED preexisted the work injury, noting that he took high-dose opioids from 2009 forward.

Dr. Hazlewood discussed Mr. Bednar's morbid obesity. He believed Mr. Bednar's condition was caused by his preexisting depression, poor coping skills, and the repeated steroids he received. Dr. Hazlewood stated that weight gain of 160 pounds cannot be explained simply by inactivity, and he recommended that Mr. Bednar make dietary changes and stop eating daily fast food.

Dr. Hazlewood also testified that Mr. Bednar's right-knee chondral problem was more likely due to the arthritic process, obesity, and age as opposed to the 2018 injury. After Dr. Tew performed surgery, Mr. Bednar's knee problem remained the same. Dr. Hazlewood stated Mr. Bednar likely sprained his knee when he hyperextended it, but it did not tear the cartilage or cause or advance the chondral defect.

Dr. Hazlewood also addressed discrepancies he noticed in the records. When Mr. Bednar reported to Dr. Ball that the TMS therapy improved his depression by 95-98%, he also reported significant depression symptoms to Dr. Sandvi. Likewise, Mr. Bednar reported to Dr. Hazlewood that he did not have depression or lower-extremity pain before the 2018 injury, but his medical records reflect otherwise. Also, Mr. Bednar said his back pain improved by the 2018 injury, but he was taking high-dose opioids.

Dr. Hazlewood considered this an "extremely complicated case." He stated Mr. Bednar sustained a minor soft-tissue injury from a simple mechanism of injury that never required surgery. Dr. Hazlewood stated Mr. Bednar's physical exam before and after the 2018 was "exactly the same." Before the 2018 injury, Mr. Bednar was already taking over 350 milligrams of morphine equivalent daily dosage (MEDD). Dr. Hazlewood stated that anything over 90 MEDD is considered high, and he did not know how Mr. Bednar was able to return to work as a nurse after his 2017 back surgery.

8

Dr. Hazlewood agreed that Mr. Bednar's pain increased, but he stated that complaints of increased pain without anatomical change are not a true medical aggravation. He stated no objective, anatomical changes occurred based on MRIs, EMGs, and physical examinations. Instead, Dr. Hazlewood believed Mr. Bednar has chronic pain syndrome complicated by taking high-dose opioids with multiple psychiatric medications. He also believed Mr. Bednar has nociplastic pain syndrome based on his testing and history.

Dr. Hazlewood assigned a 0% impairment for Mr. Bednar's 2018 injury based on lack of objective findings and nonspecific back pain. He agreed that Mr. Bednar cannot work as a nurse but stated his inability to work is not due to the 2018 injury. Further, Dr. Hazlewood recommended that Mr. Bednar consider an inpatient, multi-disciplinary detox program due to the significant, life-threatening risks of continued opioid treatment.[3]

*Lay Testimony*

Mr. Bednar, who is 52 years old, worked for Memorial for approximately three years before the January 30, 2018 injury. He did not return to work after the injury, and Memorial terminated him in August 2018 after he exhausted his FMLA leave.

Mr. Bednar explained why he cannot work as an RN. He chose not to renew his RN license, and he did not think he could complete any of Tennessee's licensing requirements to renew his license. He also testified that he cannot meet the physical and mental requirements for an RN. His narcotic and psychiatric medications impair his judgment, he falls often and uses a cane, and his depression contributes to his inability to return to work.[4]

Before this injury, Mr. Bednar said he was very active with outdoor activities, weighed 220 pounds, and worked full-time. He denied taking medication for depression or having any problems with his right knee, including falling. Mr. Bednar, who loved nursing, considered himself respected by his peers.

Mr. Bednar described a typical day now as "survival." After getting up, he drives to a fast-food restaurant, returns home, and reheats the food throughout the day. He stated he now weighs 381 pounds and knows he is morbidly obese. Mr. Bednar described himself as a "couch potato" and acknowledged that lying around is why he is overweight. He stated his pain causes him to be inactive, and he plans on having weight-loss surgery.

---

[3] As for other experts, two psychiatrists testified by deposition: Dr. Sandvi, the authorized treating physician, and Dr. Stephen Montgomery, who performed an employer's examination. Further, both Mr. Bednar and Memorial relied on experts regarding the extent of his vocational disability. Mr. Bednar offered Dr. William Wray, and Memorial relied on Daniel Patrick. However, the Court finds it unnecessary to summarize these experts' testimony, considering the holdings below.

[4] Mr. Bednar disputed various pre-2018 medical records showing he disclosed a history or symptoms of depression.

## Findings of Fact and Conclusions of Law

Mr. Bednar must prove by a preponderance of the evidence that he is entitled to the requested benefits. Tenn. Code Ann. § 50-6-239(c)(6) (2024).

Specifically, Mr. Bednar must prove, to a reasonable degree of medical certainty, that the accident contributed more than 50% in causing his need for medical treatment, considering all causes. *Id.* at -102(12). To prove a compensable aggravation of a preexisting condition, he must show that the aggravation arose primarily out of and in the course and scope of employment, to a reasonable degree of medical certainty. *Id.* at -102(12)(A), (C). No proof showed that Mr. Bednar panel-selected Dr. Ball, or any other doctor, so no presumption of correctness is attached to his opinions. *Id.* at -102(12)(E).

Mr. Bednar proved he was performing his job when the alleged injury occurred. The Court must now consider whether he presented sufficient evidence to show his need for medical treatment arose primarily from this accident.

Regarding the physical injuries, the Court considers the expert opinions of Drs. Ball and Hazlewood.[5] After reducing it by 1%, Dr. Ball concluded Mr. Bednar sustained a 15% impairment rating for right lower-extremity CRPS, a sciatic nerve injury, and testosterone deficiency from chronic opioid therapy. Dr. Hazlewood disagreed with Dr. Ball's impairment rating and diagnoses, concluding Mr. Bednar sustained a 0% impairment rating and suffered a minor soft-tissue injury that caused no anatomical changes.

In evaluating conflicting expert testimony, a trial court may consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information through other experts." *Brees v. Escape Day Spa & Salon,* 2015 TN Wrk. Comp. App. Bd. LEXIS 5, at *14 (Mar. 12, 2015).

After considering these factors, the Court finds Dr. Hazlewood's opinion more persuasive than Dr. Ball's. They are equally qualified, so that factor favors neither. The circumstances of their examinations differ. Dr. Ball treated Mr. Bednar before and after the 2018 injury, while Dr. Hazlewood examined him once. That factor favors Dr. Ball.

The critical factors that weigh in Dr. Hazlewood's favor involve the information available to the doctors and the importance of that information.

Dr. Ball acknowledged that the 2018 injury did not cause any anatomical change to Mr. Bednar's back and that most of his conditions preexisted the injury. He diagnosed Mr.

---

[5] If the proof had showed Mr. Bednar panel-selected Dr. Ball, Dr. Hazlewood rebutted the presumption of correctness.

Bednar with right-leg CRPS despite a normal 2020 EMG/NCS, and Mr. Bednar's examinations showed swelling and redness to *both* legs. Dr. Ball speculated that a pelvic sacrum MRI showed an abnormality that "could be" the result of trauma. He causally related Mr. Bednar's SI joint pain based on a lack of symptoms after his 2017 back surgery. However, Dr. Ball gave him an injection right before the injury and agreed that SI joint pain after a spinal fusion is common. He related Mr. Bednar's testosterone deficiency from long-term opioid use because he "might have" gotten him off narcotics, which is speculative. Further, Dr. Ball related Mr. Bednar's morbid obesity to the work injury, asserting his increased pain caused his inactivity.

Dr. Hazlewood, in contrast, based his opinions on objective test results, a physical examination, and a review of Mr. Bednar's records. He determined Mr. Bednar does not have CRPS for several reasons: CRPS is extremely rare; both legs showed redness and swelling from disuse; and Dr. Montgomery diagnosed somatic symptom disorder. Likewise, Mr. Bednar's SI joint testing was negative. Dr. Hazlewood concluded the right-knee chondral problem was related to the arthritic process, obesity, and Mr. Bednar's age. His testosterone deficiency preexisted the 2018 injury due to chronic opioid use since 2009. Further, Dr. Hazlewood related Mr. Bednar's morbid obesity to his preexisting depression, the repeated steroids he received from 2006 forward, and his poor diet.

The Court is aware that an aggravation of a preexisting condition can be compensable if it causes disabling pain. *Hill v. Eagle Bend Mfg.*, 942 S.W.2d 483, 488 (Tenn. 1997). However, Mr. Bednar rated his pain level at six out of ten shortly before the January 2018 incident and rated it at the *same* level shortly afterwards. Mr. Bednar attributed his increased pain to Dr. Ball attempting to wean his narcotic dosage before January 2018. Mr. Bednar's pain level increased over time, which both Drs. Ball and Hazlewood stated can occur with long-term opioid use. Dr. Hazlewood stated that Mr. Bednar's complaints of increased pain without anatomical change is not a true medical aggravation, and no objective, anatomical changes occurred based on objective testing. The Court accepts Dr. Hazlewood's opinions.

For those reasons, the Court holds Mr. Bednar did not sustain any compensable physical injuries from the January 30, 2018 injury.

The Court also holds that Mr. Bednar did not sustain any compensable mental injuries based on section 50-6-102(15). Mr. Bednar claims his physical injuries, specifically his pain, caused his mental injuries. However, section 50-6-102(15) defines a compensable mental injury, in part, as one "arising primarily out of a *compensable* physical injury . . ." (Emphasis added). Since he did not sustain any compensable physical injuries, Mr. Bednar also did not sustain any compensable mental injuries.

11

**IT IS, THEREFORE, ORDERED** as follows:

1.  The Court denies Mr. Bednar's claim for benefits.

2.  Memorial shall pay the $150.00 filing fee to the Clerk within five business days after this order becomes final under Tennessee Compilation Rules and Regulations 0800-02-21-.06 (2023).

3.  Memorial shall file form SD-2 with the Clerk within ten business days of this order becoming final.

4.  Unless appealed, this order shall become final in 30 days.

**ENTERED October 10, 2024.**

*Audrey A. Headrick*

**Judge Audrey A. Headrick**
**Court of Workers' Compensation Claims**

## APPENDIX

Exhibits:

1. Deposition of Dr. Ball
2. Deposition of Dr. Sandvi
3. Employer's Amended Medical Record Exhibits
4. Employee's Medical Records to Supplement Employer's Records
5. Employee's Second Set of Medical Records to Supplement Employer's Records
6. Deposition of Dr. Montgomery
7. Tennessee Rules and Regulations of Registered Nurses
8. Georgia Board of Nursing Nurse Practice Act
9. Memorial Initial Health Assessment
10. September 6, 2024 letter regarding Mr. Bednar's expired license (For Identification Purposes Only)
11. Memorial Annual Respirator Fit Test and Instruction
12. August 29, 2018 termination letter
13. Memorial Job Description and Performance Evaluation Tool
14. Mr. Bednar's deposition transcript, page 50
15. Mr. Bednar's deposition transcript, page 55
16. Dr. Wray's curriculum vitae
17. Dr. Wray's February 2, 2024 vocational report
18. Settlement documents for July 27, 2006 injury
19. Dr. Hazlewood's curriculum vitae
20. Dr. Hazlewood's June 20, 2024 report
21. Mr. Thompson's curriculum vitae
22. Mr. Thompson's July 16, 2024 vocational report

## CERTIFICATE OF SERVICE

I certify that a copy of this Compensation Order was sent as indicated on October 10, 2024.

| Name | Certified Mail | Email | Service sent to: |
|---|---|---|---|
| Carmen Y. Ware, Employee Attorney | | X | cyware@thewarelawfirm.com |
| Doug Dooley, Mickala Lewis, Employer's Attorneys | | X<br>X | doug.dooley@leitnerfirm.com<br>mickala.lewis@leitnerfirm.com |
| Patrick Ruth, SIVRF Attorney | | X | patrick.ruth@tn.gov |

Penny Shrum, Court Clerk
WC.CourtClerk@tn.gov

W/permission

14



<u>Right to Appeal:</u>

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board. To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
    - ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
    - ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.

    When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee. If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk. The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted. For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

    **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable. See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



### NOTICE OF APPEAL
Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____   ☐ Motion Order filed on _____

☐ Compensation Order filed on _____   ☐ Other Order filed on _____

issued by Judge _____.

Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____
_____

**Parties**

**Appellant(s) (Requesting Party):** _____ ☐Employer☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 ____.

_____
*[Signature of appellant or attorney for appellant]*